OPINION OF THE COURT
Ira B. Warshawsky, J.
Delta Financial Corporation (DFC) filed a lawsuit against defendants James Morrison, Delta Funding Residual Exchange Company, LLC, and its management company, Delta Funding Residual Management, Inc. (collectively hereinafter known as LLC) after LLC allegedly withheld certain monies allegedly due DFC. LLC thereafter commenced an action for approximately $110,000,000 for, among other things, fraud with regard to an exchange of assets between LLC and DFC in and about August 2001.
In or about July 2004, LLC commenced an action against the accounting firm of KPMG LLP for approximately $110,000,000 with regard to KPMG’s alleged misconduct in connection with an audit of DFC. All matters have been consolidated before the Honorable Ira B. Warshawsky, Justice of the Supreme Court, Nassau County. Familiarity with the facts is assumed and only relevant facts will be restated when necessary.
Attorney-Client Privilege Dispute
Currently at issue, among numerous discovery disputes in these matters, is the matter of numerous documents being withheld by DFC as privileged which LLC lodged its objection to the nonproduction of these documents. DFC has asserted the *443 attorney-client privilege with respect to numerous e-mails and attachments thereto (the withheld documents) and, as required by the rules of the court, has produced to LLC a privilege log identifying the withheld documents, the senders, and the recipients of the withheld documents and the general subject matter.
The withheld documents at issue involve correspondence and attachments thereto between Marc Miller, DFC’s general counsel and senior vice-president; Richard Blass, BFC’s executive vice-president and chief financial officer; outside counsel for DFC from Stroock & Stroock & Lavan; and BFC’s accountants from KPMG. LLC contends that BFC has inappropriately claimed attorney-client privilege with regard to the withheld documents as disclosure to KPMG constitutes a waiver of the privilege. DFC contends that the privilege was not waived as KPMG was providing assistance to BFC’s counsel in providing legal advice.
DFC provided a copy of the withheld documents to the assigned referee, Michael Cardello, Esq., for an in camera inspection along with the privilege log descriptions and a brief reason why the withheld documents should be cloaked by the attorney-client privilege which have been provided to the court.
Although Michael Cardello, Esq. has been appointed to mediate discovery issues, the court has determined that a formal decision by the court is warranted. Having considered all the submissions of the parties and reviewed all the withheld documents, the court decides the issue as set forth below.
Discussion
Law on Attorney-Client Privilege
The CPLR directs that there shall be “full disclosure of all matter material and necessary in the prosecution or defense of an action” (CPLR 3101 [a]). The test is one of usefulness and reason. (See Allen v Crowell-Collier Publ. Co., 21 NY2d 403, 406 [1968].) Section 3101 (a) embodies the policy determination that liberal discovery encourages fair and effective resolution of disputes on the merits, minimizing the possibility for ambush and unfair surprise. (See 3A Weinstein-Korn-Miller, NY Civ Prac §§ 3101.01-3101.03.)
By the same token, the CPLR establishes three categories of protected materials, also supported by policy considerations: privileged matter, which is afforded absolute immunity from discovery (CPLR 3101 [b]); attorneys’ work product, which is *444 also afforded absolute immunity (CPLR 3101 [c]); and trial preparation material, which is subject to disclosure only on a showing of substantial need and undue hardship in obtaining the substantial equivalent of materials by other means. (See CPLR 3101 [d] [2]; see also Spectrum Sys. Intl. Corp. v Chemical Bank, 78 NY2d 371 [1991].) Obvious tension exists between the policy favoring full disclosure and the policy permitting parties to withhold relevant evidence. (See Spectrum at 377.) Consequently, the burden of establishing any right to protection is on the party asserting it; the protection claim must be narrowly construed; and its application must be consistent with the purposes underlying the immunity. (Id.; Matter of Priest v Hennessy, 51 NY2d 62, 69 [1980]; Matter of Jacqueline F., 47 NY2d 215, 218 [1979]; Koump v Smith, 25 NY2d 287, 294 [1969].)
The attorney-client privilege, the oldest among common-law evidentiary privileges (8 Wigmore, Evidence § 2290 [McNaughton rev 1961]), fosters the open dialog between lawyer and client that is deemed essential to effective representation. (See Matter of Vanderbilt [Rosner—Hickey], 57 NY2d 66 [1982]; Priest at 67.) As the Court of Appeals set forth in Spectrum, “CPLR 4503 (a) states that a privilege exists for confidential communications made between attorney and client in the course of professional employment, and CPLR 3101 (b) vests privileged matter with absolute immunity.” (Spectrum at 377.) In order for the privilege to apply, the communication from attorney to client must be made “for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship.” (Rossi v Blue Cross & Blue Shield of Greater N.Y., 73 NY2d 588, 593 [1989].) The communication itself must be primarily or predominantly of a legal character. (Id. at 594.)
As stated in Rossi, “[a] corporation’s communications with counsel, no less than the communications of other clients with counsel, are encompassed within the legislative purposes of CPLR 4503, which include fostering uninhibited dialogue between lawyers and clients in their professional engagements, thereby ultimately promoting the administration of justice.” (Rossi at 592; see also Vanderbilt at 76; Priest at 67; Jacqueline F. at 218.) Furthermore, the privilege extends to attorneys “whether corporate staff counsel or outside counsel.” (Rossi at 592; see, e.g., Allied Artists Picture Corp. v Raab Prods., 38 AD2d 537 [1st Dept 1971].)
Law on Attorney-Client Privilege and Accountants
As a general rule, disclosure of attorney-client communication to a third party or communications with an attorney in the *445 presence of a third party, not an agent or employee of counsel, vitiates the confidentiality required for asserting the privilege. (See Aetna Cas. & Sur. Co. v Certain Underwriters at Lloyd’s, London, 176 Misc 2d 605, 610 [Sup Ct, NY County 1998].) The fact that the third party in receipt of the disclosure is an accountant does not normally create an exception to this rule. A client’s communications with its accountants are not afforded special protections under New York law and are subject to full disclosure. (See First Interstate Credit Alliance v Andersen & Co., 150 AD2d 291, 292 [1st Dept 1989]; see also Detroit Coke Corp. v NKK Chem. USA, Inc., 1993 WL 367060, *2, 1993 US Dist LEXIS 12880, *5 [WD NY 1993].)
Communications made to a person serving as a translator or interpreter in order to facilitate communications between the lawyer and the client are a commonly recognized exception to the third-party disclosure rule, and do not waive the attorney-client privilege. (Cf. People v Osorio, 75 NY2d 80, 84 [1989].) In United States v Kovel (296 F2d 918 [2d Cir 1961]), the Second Circuit applied the translator exception to communications to an accountant retained by the law firm for the purpose of assisting the firm in giving legal advice to its client. The court stated that:
“Accounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases. Hence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege, any more than would that of [a] linguist . . . ; the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit. By the same token, if the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought to fall within the privilege.” (Id. at 922.)
The court in Kovel was mindful to point out that “if the advice sought is the accountant’s rather than the lawyer’s, no privilege exists.” (Id. [emphasis added].)
The accountant-as-translator exception was revisited by the same court in United States v Ackert (169 F3d 136 [2d Cir *446 1999]). Although the context of the Ackert case is different, the facts bear some similarity to the one at bar, and therefore, warrant discussion.
In 1989, Goldman Sachs and Co., an investment banking firm, approached Paramount Corporation with an investment proposal. The proposed transaction was expected to reduce Paramount’s federal income tax liability. David Ackert at the time was employed by Goldman Sachs. Along with other Goldman Sachs representatives, Ackert pitched the investment proposal to representatives of Paramount at an initial meeting on September 15, 1989. After the September 15, 1989 meeting, Eugene Meyers, Paramount’s senior vice-president and tax counsel, conducted legal research and analysis in order to advise Paramount about the tax implications of the proposed investment. In the course of this research, Meyers contacted Ackert, and the two individuals had several follow-up meetings to discuss various aspects of the investment proposal. Meyers initiated these discussions to learn more about the details of the proposed transaction and its potential tax consequences so that he could advise his client, Paramount, about the legal and financial implications of the transaction.
Seven years later, the IRS conducted an audit of Paramount. In connection with the audit, the IRS issued a summons to Ackert seeking his testimony about the investment proposal. Paramount asserted the attorney-client privilege with respect to questions concerning any conversation Ackert had with Meyers or in Meyers’ presence.
The United States filed suit in the District Court seeking to enforce the summons through an order directing Ackert to appear before the IRS and answer its questions. The lower court heard argument from Paramount and the United States and conducted an in camera interview with Ackert about the substance of these conversations at issue.
Following the in camera proceedings, the lower court ruled in favor of Paramount, concluding that the Government’s inquiry into the Ackert-Meyers conversations “would invade privileged communications” (id. at 138). The lower court held that if Meyers had been collecting information from Ackert about the proposed investment in order to give legal advice to Paramount, the conversations would be privileged. The Government appealed this ruling.
In Ackert, the Second Circuit reversed the lower court’s ruling to protect the disclosure of the content of the conversations. *447 (Id.) The Second Circuit stated that “the privilege protects communications between a client and an attorney, not communications that prove important to an attorney’s legal advice to a client.” (Id. at 139.) The Second Circuit reasoned that “a communication between an attorney and a third party does not become shielded . . . solely because the communication proves important to the attorney’s ability to represent the client.” (Id.)
The Second Circuit distinguished Kovel by stating that the privilege was maintained in Kovel because “the purpose of the third party’s participation [was] to improve the comprehension of the communications between attorney and client.” (Id.) In contrast, in Ackert, the accountant was sought out “for information [the client] did not have about the proposed transaction and its tax consequences.” (Id. at 139-140 [emphasis added].) The court went on to state that “Meyers was not relying on Ackert to translate or interpret information given to Meyers by his client [and] [b]ecause Ackert’s role was not as a translator or interpreter of client communications, the principle of Kovel does not shield his discussion with Meyers.” (Id. at 140-141.)
In another case involving this issue, the District Court for the Northern District of California stated that the Ackert court’s reading of Kovel “aptly serves the purpose underlying the privilege (facilitate consultation) without unduly impinging on the truth finding process.” (United States v ChevronTexaco Corp., 241 F Supp 2d 1065, 1071 [ND Cal 2002].) It further stated that
“[t]he interpreter analogy and the statement that the accountant is needed to facilitate the client’s consultation both strongly indicate that Kovel did not intend to extend the privilege beyond the situation in which an accountant was interpreting the client’s otherwise privileged communications or data in order to enable the attorney to understand those communications or that client data.” (Id.)
The court in ChevronTexaco pointed out that “[t]ax questions are so closely governed by the Revenue Code and by IRS and Tax Court rulings about the meaning of the Code that an accountant’s advice will be legal’ in the sense that it is based in statute and interpretations of statutes,” and thus denied the privilege “where the accountant is hired merely to give additional legal advice about complying with the tax code even where doing so would assist the attorney in advising the client.” (Id. at 1072.)
In yet another case with similar facts, the court in Black & Decker Corp. v United States (219 FRD 87 [2003]) held after an *448 in camera review of documents that the accountant Deloitte & Touche (D & T) did not provide “translation” services for in-house counsel of plaintiff Black & Decker (B & D) but rather D & T was providing hybrid advice to plaintiff, tax and business advice which, by its nature, had a legal component. Therefore, the derivative privilege protection recognized by Kovel and subsequent cases did not apply to the documents.
The facts of Black & Decker warrant discussion. In Black & Decker, the plaintiff B & D began to explore the possibility of establishing a health care entity to manage the health care benefits of its employees. The creation of this “special purpose entity” required a series of transactions in which the plaintiff exchanged money, stock and liabilities with the special purpose entity. As a result of the transaction, the plaintiff claimed a large capital loss and a total federal tax refund of $57 million for several tax years. After not receiving its refund, B & D brought an action to receive its refund.
During discovery, the Government sought documents related to the transaction from both plaintiff and D & T, the accounting firm retained by B & D for advice concerning the transaction. B & D refused to produce a number of documents that included communications between plaintiffs in-house tax attorneys and D & T based upon its argument that the documents in question were protected by the attorney-client privilege because the purpose of the communications between D & T and plaintiff was to support plaintiffs in-house attorneys in the preparation of legal advice to their client (B & D’s management) regarding the transaction at issue.
The court in B & D set forth several factors that it thought were relevant to determine the applicability of this derivative privilege: (1) to whom was the advice provided — counsel or the client; (2) where client’s in-house counsel is involved, whether counsel also acts as a corporate officer; (3) whether the accountant is regularly employed as the client’s auditor or advisor; and (4) which parties initiated or received the communication. Using these factors, the Black & Decker court found the communications did not directly involve the company’s general counsel; the primary counsel involved was also vice-president of taxes; the majority of communications were not directed by the accountants to the company’s in-house counsel but to various other individuals in the company; and the accounting firm was not regularly employed by the party. (See Black & Decker at 90.) Although the court stated that an application of the factors “do[es] *449 not compel a clear conclusion that D & T was needed to facilitate communications between plaintiff and their attorneys” (id.), given all the facts, relevant case law and the documents at issue, the court held that the accountants were not providing “translation” services for in-house counsel, and thus, the documents were deemed not protected by the attorney-client privilege.
Application of the Law to the Issue at Bar
In the instant matter, DFC asserts that the Kovel exception applies to the withheld documents. DFC claims that every communication sought to be protected represents a lawyer’s request for assistance in understanding an accounting or tax matter, and, therefore, the privilege is not waived. However, based upon the facts of this case and the relevant case law, it appears that Kovel and its progeny do not support DFC’s position.
The application of the factors set forth in Black & Decker yields the following results: the majority of the communications in question consist of correspondence not between counsel and KPMG but rather between Mr. Blass, DFC’s chief executive officer and executive vice-president, and various KPMG employees. Mr. Miller, DFC’s general counsel, is also a senior vice-president. KPMG was also employed as DFC’s auditor and is, in fact, a party in this action in connection with that audit. Finally, a majority of the communications were initiated directly by Mr. Blass, seeking KPMG’s input and advice on tax account related issues. The application of the factors set forth in Black & Decker to the facts of the instant case does not support DFC’s position. Furthermore, DFC’s description of several of the documents in question in the privilege log state that they were sent to KPMG for “tax advice.”
Based on Black & Decker’s four-prong test, the relevant case law beginning with Kovel and its progeny, and an in camera review of all the documents, the issue is decided as follows:
Document Nos. 1600 and 4585 are privileged as they consist of communications solely between attorney and client of a primarily or predominantly legal character. The derivative attorney-client analysis is therefore not applicable.
Document Nos. 536, 1139, 1140, 1232, 1316,1354, 1611, 1612, 1631, 1664, 1696, 1597, 1604, 1606, 1608, 1612, 1632, 1633, 1655, 1664, 1671, 1687, 1688, 1713, 1743, 1744, 1745, 1746, 1747, 1750, 1752, 1774, 1781, 4345, 5150, 5151, 5156, 5195 and 5446, including all their attachments, are not privileged, as the *450 derivative attorney-client privilege recognized by Kovel and its progeny is not applicable to those documents set forth above.
Conclusion
Accordingly, DFC shall produce document Nos. 536, 1139, 1140, 1232, 1316, 1354, 1611, 1612, 1631, 1664, 1696, 1597, 1604, 1606, 1608, 1612, 1632, 1633, 1655, 1664, 1671, 1687, 1688, 1713, 1743, 1744, 1745, 1746, 1747, 1750, 1752, 1774, 1781, 4345, 5150, 5151, 5156, 5195 and 5446 and their respective attachments in their entirety. Document Nos. 1600 and 4585 are properly subject to the attorney-client privilege.